PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROBERT JEFFERY,

*Defendant-Appellant.*

No. 09-5229

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Senior District Judge.
(1:09-cr-00196-CMH-1)

Argued: October 28, 2010

Decided: February 9, 2011

Before TRAXLER, Chief Judge, WILKINSON, Circuit
Judge, and Bobby R. BALDOCK, Senior Circuit Judge of
the United States Court of Appeals for the Tenth Circuit,
sitting by designation.

Affirmed by published opinion. Chief Judge Traxler wrote the
opinion, in which Judge Wilkinson and Senior Judge Baldock
joined.

## COUNSEL

**ARGUED:** Christopher Robert Kennedy Leibig, ZWER-
LING, LEIBIG & MOSELEY, PC, Alexandria, Virginia, for

Appellant. Ellen Ruth Meltzer, UNITED STATES DEPART-MENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Lanny A. Breuer, Assistant Attorney General, Criminal Division, Steve A. Linick, Andrew N. Gentin, Brigham Q. Cannon, Fraud Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Appellee.

---

**OPINION**

TRAXLER, Chief Judge:

Robert Jeffery was convicted by a jury of theft of government property, *see* 18 U.S.C.A. § 641 (West Supp. 2010), and conspiracy to steal government property, *see* 18 U.S.C.A. § 371 (West 2000), in connection with a scheme to steal fuel from a bulk "fuel farm" run by the United States Army in Iraq. Jeffery appeals, challenging his conviction and sentence. Finding no error, we affirm.

I.

As part of its military efforts in Iraq, the United States Army operated Victory Bulk Fuel Point ("VBFP") within Camp Liberty, a military installation near the Baghdad International Airport. The VBFP supplied bulk diesel and jet fuel to the military and to certain government contractors in the Baghdad area. Contractors who were permitted to withdraw fuel were required to present a "Common Access Card" to gain access to Camp Liberty; to enter the VBFP, the contractor was required to present a "Memorandum for Record" ("MFR"), which was issued to the contractor by the United States government.

The evidence presented at trial established that in January 2008, Defendant Jeffery, who was retired from the Navy and

then living in the Philippines, was recruited by his friend Robert Young to work in Iraq with Young and Lee DuBois, a retired Army captain. The group used forged documents to obtain common access cards to get access to Camp Liberty and used forged MFRs, supposedly issued on behalf of Future Services, a Kuwaiti company serving as a contractor to the United States government, to steal large quantities of fuel from the VBFP to sell on the Iraqi black market. The scheme was a profitable one, bringing in approximately $30,000 a day. Jeffery served as the lead escort for trucks making daily runs to draw fuel from the VBFP. Jeffery was paid $15,000 per month (later increased to $25,000 per month) for his services as an escort. The scheme ended in late May 2008, when Jeffery and his compatriots learned that their drivers and trucks had been covertly photographed and after they found tracking devices on some of the trucks.

The evidence presented at trial suggested that Jeffery initially believed that the group was working under a legitimate contract. After only a few weeks on the job, however, Jeffery was at least suspicious about the legality of the work. Jeffery left Iraq in early February 2008, during a period when the group was not making any fuel runs. Before he left, Jeffery told DuBois that he wanted no part of the contract if it was a "pirate contract." J.A. 268.

After Jeffery left Iraq, Young sent him an email trying to explain the nature of the work. As to Jeffery's question to DuBois about the validity of the contract under which they were withdrawing the fuel, Young stated:

> The contracts are valid, we are utilizing a condition of the contract — ie: the uploading of fuel, [without] the Company . . . being aware of it. A contracting officer is on the payroll and we are using the proceeds for our own advantage. . . . Now that you are aware of the inherent risk involved, you['re] welcome to return.

> . . . . We are planning on running this [until] 1 July
> and see how it looks at that time. I don't see a prob-
> lem and this could go on for 1-2 years or more. I
> would appreciate it if you would not discuss the
> *quasi legality* of what we are doing to anyone. . . .
> The less known by others not involved — the better.
> If you want to come back [until] the end of June,
> great, then I want you next week.

J.A. 544 (emphasis added).

After receiving the email from Young, Jeffery returned to Iraq and continued working for the next few months. As the operation was winding down in May of 2008, Jeffery sent and received emails that strongly suggest his full awareness of the criminal nature of the enterprise. For example, on May 15, 2008, Young (who was then on vacation in the Philippines) sent an email to Jeffery and others stating that "Our golden goose is about to be run over by a tr[uc]k. Then we all go home . . . hopefully, unless we get a vacation courtesy of [U]ncle [S]am looking out [through] the metal windows." J.A. 581. Jeffery responded to that email by saying that he did not "have a sense that things are too far out of control," but that if he believed "things are getting dangerous, you will be the first to know and I will be on a plane out of here to join you." J.A. 580. On May 18, Jeffery sent an email saying that he kept "a healthy sense of paranoia on tap as well as an evacuation plan." J.A. 643. Despite his misgivings, Jeffery continued to make fuel runs after sending these emails.

On May 23, Jeffery sent an email saying that he suspected "the Army is building a case" and that "[i]t is my sense it's time to shut this down and see how the dust settles. I do not have a sense of immediate panic, but think it prudent for me to bail out. I will make plans for Monday afternoon departure." J.A. 674. In another email sent to Young the next day, Jeffery stated, "I feel the Army is connecting the dots and I do not feel like being inter[r]ogated. My gut tells me to go

now. I am making arrangements for earliest departure." J.A. 684. Soon thereafter, Jeffery told Young, "The goose is dead; I am gone." J.A. 682. Jeffery left Iraq on May 26, 2008, and returned to the Philippines, where he was arrested several months later.

Jeffery and Young were indicted for conspiracy and theft of government property. DuBois, who was the first of the group to be arrested, pleaded guilty to an information and agreed to testify against the others. Young pleaded guilty about three weeks before trial was scheduled to begin, and Jeffery proceeded to trial alone. DuBois testified against Jeffery, and the jury convicted him on both counts. The district court imposed a below-Guidelines sentence of 48 months. This appeal followed.

## II.

Jeffery first challenges the voir dire of the jury venire, arguing that the district court erred by refusing to use his proposed questions about reasonable doubt and the burden of proof. We disagree.

Jeffery submitted questions that he proposed be used during voir dire, including several questions that addressed the jurors' willingness to apply the reasonable-doubt standard and to hold the government to its burden of proof.[1] The district court, however, did not use Jeffery's proposed questions. The

---

[1]For example, one of Jeffery's submissions stated that "the Government alleges that Mr. Jeffery stole a large amount of fuel from the United States during war time in a war zone. Is there anything about this allegation that would cause you to feel a bias towards Mr. Jeffery? Is there anything about this allegation that would make it difficult for you to acquit Mr. Jeffery even if the government failed to prove his guilt beyond a reasonable doubt?" J.A. 98. Another asked whether Jeffery should be punished for his association with Young and DuBois, who "engaged in a fraud against the United States . . . , even if there is a reasonable doubt about whether [Jeffery] was aware of the fraud?" J.A. 98.

court's voir dire consisted of fairly standard questions, such as whether the potential jurors knew about the facts of the case, or whether they or their family worked in law enforcement. The court did not ask any questions that explicitly mentioned the reasonable-doubt standard or the government's burden of proof, and the court asked only one question that touched on the obligations of the jurors when deciding the case.[2]

Jeffery urges us to hold that district courts should *always* include in their voir dire questions about a juror's ability to apply the reasonable-doubt standard and to hold the government to its burden of proof. If we are unwilling to adopt that rule, Jeffery urges us to hold that such questions must be asked in every case where the defendant so requests. Finally, Jeffery argues that even if the questions are not always required even if requested by the defendant, they were nonetheless required in this case, given the nature of the charges against him. According to Jeffery, the charges against him — stealing from the Army during wartime in a war zone — are highly inflammatory and could "raise[ ] the flag of treachery" in the minds of jurors. Brief of Appellant at 23. Moreover, Jeffery contends that his friendship with Young, the ringleader of the scheme, "could have led reasonable, conscientious, and patriotic jurors to have difficulty applying the burden of proof and reasonable doubt to Mr. Jeffery's actual conduct." *Id.* Jeffery argues that the questions he proposed would have weeded out potential jurors who might not have been able to get past the nature of the crimes and, at the very least, would have allowed him to more intelligently exercise his peremptory strikes.

"Voir dire plays an essential role in guaranteeing a criminal

---

[2]The court asked, "Considering all of the questions I've asked you, is there any reason why any one of you cannot sit on this jury and render a fair and impartial verdict based on the evidence presented here in the courtroom and the instructions on the law as will be given you by the Court?" J.A. 116.

defendant's Sixth Amendment right to an impartial jury," in that "it enables the court to select an impartial jury and assists counsel in exercising peremptory challenges." *United States v. Lancaster*, 96 F.3d 734, 738 (4th Cir. 1996) (en banc) (internal quotation marks and alterations omitted). "Despite its importance," however, "the adequacy of *voir dire* is not easily subject to appellate review." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion).

> The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions. In neither instance can an appellate court easily second-guess the conclusions of the decisionmaker who heard and observed the witnesses.

*Id.* (citations omitted). Appellate courts thus accord great deference to the district court's decisions about the conduct of voir dire. *See Lancaster*, 96 F.3d at 738. "Although a trial court's discretion is not without limits, it is a rare case in which a reviewing court will find error in the trial court's conduct of voir dire." *Sasaki v. Class*, 92 F.3d 232, 239 (4th Cir. 1996) (internal quotation marks omitted).

The Supreme Court has not required specific voir dire questions except in very limited circumstances — capital cases, *see Morgan v. Illinois*, 504 U.S. 719, 739 (1992), and cases where racial or ethnic issues are "inextricably bound up with the conduct of the trial" such that inquiry into racial or ethnic prejudice of the jurors is constitutionally mandated, *see Rosales-Lopez*, 451 U.S. at 189 (internal quotation marks omitted). In non-capital cases such as this one, with no issues of racial or ethnic prejudice, "the district court need not pursue a specific line of questioning on voir dire, provided the voir dire as a whole is reasonably sufficient to uncover bias or partiality in the venire." *Lancaster*, 96 F.3d at 739-40.

Jeffery's view that we should require district courts in all cases to inquire about a juror's ability to apply the reasonable-doubt standard and to hold the government to its burden of proof "is simply inconsistent with the broad deference traditionally and wisely granted trial courts in their conduct of voir dire," *id.* at 741, and we therefore decline to adopt the *per se* rule he suggests.

Jeffery's intermediate argument that inquiry into the reasonable-doubt standard and burden-of-proof issue is required when requested by the defendant has been accepted by the Sixth Circuit. *See United States v. Hill*, 738 F.2d 152, 153 (6th Cir. 1984) ("Jury instructions concerning the presumption of innocence and proof beyond reasonable doubt are fundamental rights possessed by every citizen charged with a crime in these United States. This circuit has held that a fairly phrased question concerning whether or not a juror could accord such rights to a defendant in a criminal trial must, if requested, be submitted by the trial court as a fundamental part of voir dire."); *accord United States v. Blount*, 479 F.2d 650, 651-52 (6th Cir. 1973). This court, however, has rejected the Sixth Circuit's approach, *see United States v. Robinson*, 804 F.2d 280, 281 (4th Cir. 1986), as have most other circuits, *see United States v. Beckman*, 222 F.3d 512, 519 (8th Cir. 2000); *United States v. Sababu*, 891 F.2d 1308, 1325 (7th Cir. 1989); *United States v. Miller*, 758 F.2d 570, 573 (11th Cir. 1985) (per curiam); *United States v. Price*, 577 F.2d 1356, 1366 (9th Cir. 1978); *United States v. Ledee*, 549 F.2d 990, 993 (5th Cir. 1977). Because the intermediate rule sought by Jeffery has already been rejected in this circuit, this panel is not at liberty to revisit the issue. *See, e.g.*, *United States v. Rivers*, 595 F.3d 558, 564 n.3 (4th Cir. 2010) ("A panel of this court cannot overrule, explicitly or implicitly, the precedent set by a prior panel of this court. Only the Supreme Court or this court sitting en banc can do that." (internal quotation marks and alteration omitted)).

We are thus left with Jeffery's last-ditch claim that, given the inflammatory nature of the allegations against him,

inquiry into the reasonable-doubt and burden-of-proof issues was required in this case. We disagree.

Stealing a critically important commodity from the Army during wartime in a war zone is contemptible conduct to be sure, but many, many criminal cases involve conduct that is even more contemptible. We see nothing so unusual or prejudicial in the facts of this case to warrant departure from our established rule that the district court generally is not obligated to inquire about reasonable-doubt and burden-of-proof issues during voir dire, as long as the selected panel is ultimately properly instructed. *See Robinson*, 804 F.2d at 281 ("The claim of error [is that] the trial judge refused to specifically ask the *full venire* if they understood and would abide by the court's instructions on reasonable doubt, presumption of innocence, and burden of proof . . . . The *trial jury* in the present case was twice instructed on these points of law, and this was quite sufficient." (emphasis added)). The voir dire conducted by the district court was "reasonably sufficient to uncover bias or partiality in the venire," *Lancaster*, 96 F.3d at 739-40, and the district court properly instructed the trial jury about the reasonable-doubt standard and the burden of proof, *see Robinson*, 804 F.2d at 281. We therefore reject Jeffery's claim that the district court erred by rejecting his proposed voir dire questions.

## III.

Jeffery was convicted of violating 18 U.S.C.A. § 641, which provides for up to ten years' imprisonment for anyone who "embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof." 18 U.S.C.A. § 641. Jeffery argues that knowledge that the property belonged to the United States is an element of § 641, and that the district court erred by refusing to so instruct the jury. Jeffery thus contends that we must vacate his substantive

§ 641 conviction and the conviction for conspiring to violate § 641. We disagree.

In *United States v. Feola*, 420 U.S. 671 (1975), the Supreme Court considered the same argument in the context of 18 U.S.C. § 111, which prohibits assaults against federal officers. The Supreme Court concluded that the victim's status as a federal officer was jurisdictional and that knowledge of the victim's status was not required:

> [I]n order to effectuate the congressional purpose of according maximum protection to federal officers by making prosecution for assaults upon them cognizable in the federal courts, § 111 cannot be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer. All the statute requires is an intent to assault, not an intent to assault a federal officer. A contrary conclusion would give insufficient protection to the agent enforcing an unpopular law, and none to the agent acting under cover.

*Id.* at 684. The Court reached a similar conclusion in *United States v. Yermian*, 468 U.S. 63 (1984). At issue in *Yermian* was 18 U.S.C. § 1001, which prohibits making a false statement in a matter within the jurisdiction of an agency or department of the United States government. *See Yermian*, 468 U.S. at 64. The Court held that the government was not required to prove that the defendant knew the false statement was being made to a federal agency:

> The statutory language requiring that knowingly false statements be made in any matter within the jurisdiction of any department or agency of the United States is a jurisdictional requirement. Its primary purpose is to identify the factor that makes the false statement an appropriate subject for federal concern. Jurisdictional language need not contain the

same culpability requirement as other elements of the offense. Indeed, we have held that the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute.

*Id.* at 68-69 (internal quotation marks omitted).

Every circuit to have considered the question, including this one, has concluded that, with regard to § 641, government ownership of the stolen property is a jurisdictional fact only and that knowledge of the government's ownership is not an element of § 641. *See United States v. Bauer*, 713 F.2d 71, 73 n.4 (4th Cir. 1983) ("Unawareness by Bauer that ownership had shifted to the United States did not affect guilt. Knowledge that stolen property belonged to the government is not an element of the offense. The sole reason for including the requirement that the property belongs to the government is to state the foundation for federal jurisdiction." (internal quotation marks omitted); *accord United States v. Baker*, 693 F.2d 183, 186 (D.C. Cir. 1982); *United States v. Speir*, 564 F.2d 934, 937-38 (10th Cir. 1977) (en banc); *United States v. Jermendy*, 544 F.2d 640, 641 (2d Cir. 1976) (per curiam); *United States v. Crutchley*, 502 F.2d 1195, 1201 (3d Cir. 1974); *United States v. Denmon*, 483 F.2d 1093, 1094-95 (8th Cir. 1973); *United States v. Smith*, 489 F.2d 1330, 1334 (7th Cir. 1973); *United States v. Boyd*, 446 F.2d 1267, 1274 (5th Cir. 1971); *United States v. Howey*, 427 F.2d 1017, 1018 (9th Cir. 1970). As the Tenth Circuit explained in *Speir*:

[I]n light of *Feola* we must agree that the wording of [§ 641] and its legislative history . . . show no intent that it be a required element of the federal offense that the defendant knew the stolen property belonged to the Government. Use of the common law terms such as embezzlement, larceny and the like in the statute, without a contrary direction, may be taken as satisfaction with widely accepted definitions, not as

a departure from them. And it was not an essential part of the common law larceny-type offense that the thief knew who owned the property he took; it was enough that he knew it did not belong to him.

The requirement in § 641 that the stolen property be a record, voucher, money, or thing of value of the United States furnishes the jurisdictional basis for the federal offense. However, knowledge of such jurisdictional facts is not generally an element of the required intent under federal statutes.

*Speir*, 564 F.2d at 937-38 (citations, alterations & internal quotation marks omitted).

Jeffery, however, contends that the Supreme Court's recent decision in *Flores-Figueroa v. United States*, 129 S. Ct. 1886 (2009), changes the analysis and compels the conclusion that knowledge of government ownership is an element of § 641. We disagree.

In *Flores-Figueroa*, the Supreme Court considered 18 U.S.C. § 1028A, which provides an additional criminal penalty if the defendant "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." *Flores-Figueroa*, 129 S. Ct. at 1887 (emphasis omitted). The Court concluded that, as matter of "ordinary English grammar," the word "knowingly" must be understood to apply both to "a means of identification" and "of another person," *id.* at 1890, and that the government was required to prove that the defendant knew that the means of identification he was using in fact belonged to another person, *see id.* at 1894.

Section 1028A's "of another person" element, however, is not a jurisdictional element, and there is nothing in *Flores-Figueroa* to suggest that the Supreme Court intended to silently overrule the *Feola* and *Yermian* line of cases holding that knowledge of jurisdictional facts is generally not

required. To the contrary, the Court in *Flores-Figueroa* relied heavily on its decision in *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994), which addressed whether 18 U.S.C. § 2252, prohibiting various activities involving visual depictions of minors engaged in sexually explicit conduct, required proof that the defendant knew the person in the image was a minor. The *X-Citement Video* Court held that the statute did require such proof, *see* 513 U.S. at 66, but the Court reiterated that a statute's scienter requirements generally do not apply to jurisdictional facts:

> In this regard, age of minority is not a "jurisdictional fact" that enhances an offense otherwise committed with an evil intent. *See, e.g.*, *United States v. Feola*, 420 U.S. 671 (1975). There, the Court did not require knowledge of "jurisdictional facts" — that the target of an assault was a federal officer. Criminal intent serves to separate those who understand the wrongful nature of their act from those who do not, but does not require knowledge of the precise consequences that may flow from that act once aware that the act is wrongful.

*Id.* at 72 n.3.

Jeffery, however, insists that while the "of the United States" requirement of § 641 is a jurisdictional fact, it is not *only* jurisdictional. *See Feola*, 420 U.S. at 676 n.9 ("The significance of labeling a statutory requirement as 'jurisdictional' is not that the requirement is viewed as outside the scope of the evil Congress intended to forestall, but merely that the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute. The question, then, is not whether the requirement is jurisdictional, but whether it is *jurisdictional only*." (emphasis added)). Jeffery argues that, like the age-of-the-minor issue in *X-Citement Video*, the government-ownership requirement serves as the

dividing line between innocent and unlawful conduct, and that "[c]ases have consistently held that a *mens rea* requirement must accompany the elements of an offense that criminalizes otherwise lawful conduct." Brief of Appellant at 27.

The statute at issue in *X-Citement Video* involved the use of minors in depictions of sexually explicit conduct. Because the statute addresses sexually explicit, but not obscene, conduct, the depictions would be perfectly legal if the performers were adults rather than minors. *See X-Citement Video*, 513 U.S. at 73 ("[O]ne would reasonably expect to be free from regulation when trafficking in sexually explicit, though not obscene, materials involving adults. Therefore, the age of the performers is the crucial element separating legal innocence from wrongful conduct."). Section 641's requirement of government ownership, however, does not separate legal innocence from wrongful conduct, for the simple reason that stealing is wrongful conduct whether or not the stolen property belonged to the government. Because the crime occurred in Iraq, Jeffery perhaps could not have been prosecuted in the United States had the stolen fuel not belonged to the government. His conduct was nonetheless wrongful, because he took something that did not belong to him. We therefore conclude that the "of the United States" requirement of § 641 is a jurisdictional fact that is "jurisdictional only." *Feola*, 420 U.S. at 676 n.9.

Because the Supreme Court in *Flores-Figueroa* did not overrule the jurisdictional facts line of cases, we must continue to follow *Feola* and our own decision in *Bauer*. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (internal quotation marks omitted)); *United States v. Ruhe*, 191 F.3d 376, 388 (4th Cir. 1999) ("[A]s a simple panel, we are bound by prior precedent from other

panels in this circuit absent contrary law from an *en banc* or Supreme Court decision."). Accordingly, we conclude that the district court properly rejected Jeffery's argument that the government was required to prove that he knew the fuel belonged to the Army. *See Bauer*, 713 F.2d at 73 n.4 ("Knowledge that stolen property belonged to the government is not an element of the [§ 641] offense." (internal quotation marks omitted)); *see also United States v. Rehak*, 589 F.3d 965, 974-75 (8th Cir. 2009) (rejecting argument that *Flores-Figueroa* effectively overruled the caselaw holding that § 641 does not require the government to prove that the defendant knew the stolen property was owned by the government), *cert. denied*, 130 S. Ct. 2130 (2010).

## IV.

We turn now to Jeffery's challenges to his sentence. Jeffery first contends that even though he went to trial, the district court should have awarded him a two-level acceptance-of-responsibility reduction. We disagree.

A reduction for acceptance of responsibility is appropriate for a defendant who "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). Although the reduction "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt," going to trial does not "automatically pre-clude" the adjustment. *Id.* at cmt. n.2. In "rare situations," such as when the "defendant goes to trial to assert and pre-serve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)," an adjustment may still be appropriate. *Id.*

Jeffery argues that he was entitled to the reduction because he went to trial only "to test the applicability of 18 U.S.C. § 641 to his conduct, that is, hoping to prevail on the question

of whether knowledge of government property is an element of the offenses." Brief of Appellant at 31. Whether the government was required to prove Jeffery's knowledge that the fuel belonged to the government, however, is not unrelated to factual guilt, and nor is it an issue that affects the applicability of § 641 to Jeffery's conduct. There is no dispute that Jeffery and his compatriots stole fuel that belonged to the United States, and § 641 is thus applicable to Jeffery's conduct. The government may have had a more difficult time proving Jeffery's guilt if it had been required to prove that Jeffery knew the fuel belonged to the government when he stole it, but such a requirement would not have somehow rendered § 641 inapplicable to Jeffery's conduct. Moreover, Jeffery strongly asserted his innocence at trial, arguing that he believed all along that the group was operating under a legitimate contract. Under these circumstances, we simply cannot conclude that the district court clearly erred by denying an acceptance adjustment. *See United States v. Dugger*, 485 F.3d 236, 239 (4th Cir. 2007) ("We review a district court's decision concerning an acceptance-of-responsibility adjustment for clear error.").

Finally, Jeffery raises what we understand to be a challenge to the substantive reasonableness of his sentence, an argument premised on a comparison of himself and Lee DuBois, the co-conspirator who testified against Jeffery.

DuBois, who was higher up the criminal ladder than Jeffery and whose share of the profits was approximately ten times greater than Jeffery's, was sentenced to 36 months, while Jeffery was sentenced (by a different judge) to 48 months. Moreover, Jeffery argues, DuBois perjured himself at Jeffery's trial by attempting to minimize his culpability in ways that were inconsistent with the statement of facts incorporated into DuBois's plea agreement.[3] Jeffery acknowledges that

---

[3]The government's position is that by agreeing to the statement of facts when he pleaded guilty, DuBois simply acknowledged what the government would have been able to prove if he had gone to trial.

DuBois's sentence was the result of DuBois's cooperation with the government in Jeffery's trial and the government's subsequent request that DuBois's sentence be reduced because of his substantial assistance in Jeffery's trial. *See* U.S.S.G. § 5K1.1. Jeffery nonetheless insists that "[i]f the federal sentencing model, which so heavily privileges cooperators, is to have the appearance of integrity, the concept of 'providing assistance' to the Government must necessarily mean truthful assistance." Brief of Appellant at 34. Jeffery thus argues that, given these circumstances, the disparity between his sentence and DuBois's sentence is unwarranted and that he is therefore entitled to be re-sentenced. *See* 18 U.S.C.A. § 3553(a)(6) (West 2000) (requiring courts to consider when imposing sentence "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). We disagree.

DuBois pleaded guilty, assisted the government in this investigation, and testified to the government's satisfaction in Jeffery's trial.[4] Jeffery is in no position to complain about the government's evaluation of DuBois's assistance, and that assistance is more than sufficient to justify the different sentences. *See United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) ("[D]efendants who cooperate with the government and enter a written plea agreement are not similarly situated to a defendant who provides no assistance to the gov-

---

[4]As additional support for his claim, addressed above, that he should have received an acceptance-of-responsibility reduction, Jeffery notes that DuBois received an acceptance reduction. Jeffery contends it is unfair for DuBois, who he contends testified falsely by trying to minimize his own culpability claims, to have received the reduction when Jeffery did not. This argument is without merit. DuBois received the reduction because he waived indictment and pleaded guilty to an information, while Jeffery did not receive the reduction because he went to trial to contest his factual guilt. Jeffery's insistence that DuBois committed perjury cannot convert Jeffery's failure to accept responsibility into the timely acceptance of responsibility required by U.S.S.G. § 3E1.1.

ernment and proceeds to trial."), *cert. denied*, 130 S. Ct. 2342
(2010); *United States v. Perez-Pena*, 453 F.3d 236, 243 (4th
Cir. 2006) ("[C]omparing the sentences of defendants who
helped the Government to those of defendants who did not . . .
is comparing apples and oranges. For this reason, Congress
could not have intended that disparities resulting from the
exercise of prosecutorial discretion could be determined to be
'unwarranted.'").

Moreover, district courts have extremely broad discretion
when determining the weight to be given each of the
§ 3553(a) factors. *See Gall v. United States*, 552 U.S. 38, 51
(2007) (explaining that appellate courts "must give due defer-
ence to the district court's decision that the § 3553(a) factors,
on a whole, justify" the sentence imposed); *United States v.
Langston*, 590 F.3d 1226, 1237 (11th Cir. 2009) ("The weight
to be accorded any given § 3553(a) factor is a matter commit-
ted to the sound discretion of the district court, and we will
not substitute our judgment in weighing the relevant factors."
(internal quotation marks omitted)). Jeffery made all of the
same arguments about DuBois to the district court, but the
district court, after specifically considering the sentences
imposed on the co-conspirators and the other circumstances of
the case, ultimately determined that a sentence of 48 months
(which was significantly below the advisory Guidelines sen-
tencing range of 63-78 months) was appropriate. Even if
DuBois did commit perjury, we simply cannot conclude that
the district court abused its discretion by declining to give dis-
positive weight to the sentence received by DuBois. We there-
fore reject Jeffery's claim that his below-Guideline sentence
of 48 months is unreasonable.

V.

To summarize, we conclude that the district court's conduct
of voir dire was sufficient and that the district court correctly
held that the government was not required to prove that Jeff-
ery knew the fuel belonged to the United States. We also con-

clude that the district court committed no error when sentencing Jeffery. Accordingly, we hereby affirm Jeffery's convictions and sentence.

*AFFIRMED*