**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-4029**

---

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MARGARET ANN SUTTON, a/k/a Margaret A. Sutton, a/k/a Margaret Ann Simmons, a/k/a Maxie,

Defendant – Appellant.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  Roderick C. Young, District Judge.  (2:21-cr-00074-RCY-RJK-2)

---

Argued:  September 25, 2024                    Decided:  January 22, 2025

---

Before WILKINSON, RICHARDSON, and RUSHING, Circuit Judges.

---

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge Wilkinson and Judge Rushing joined.

---

**ARGUED:**  Patricia A. René, THE RENÉ LAW FIRM, Williamsburg, Virginia, for Appellant.  Jacqueline Romy Bechara, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:**  Jessica D. Aber, United States Attorney, Richmond, Virginia, Kevin M. Comstock, Assistant United States Attorney, Matthew J. Heck, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

RICHARDSON, Circuit Judge:

The saying "don't mix business with pleasure" counsels separating personal and professional pursuits. This wise advice is often ignored, as it was here. Vicente Andres and Margaret Sutton's business relationship blossomed into a romantic one. But unlike most office romances, their business involved drugs and guns.

Sutton's involvement with those drugs and guns led to her conviction of various federal criminal offenses. She appeals her convictions and resulting twenty-nine-year sentence. Because there was sufficient evidence for a reasonable factfinder to convict her, and because her sentence was neither procedurally nor substantively unreasonable, we affirm.

## I.     Background

Vicente Andres is a drug dealer who sold methamphetamine and other drugs for years. Andres and one girlfriend, Robin West, lived together in a house in Norfolk, Virginia, until she moved out in March 2021.

Before March 2021, Margaret Sutton was one of Andres's customers. She regularly visited the house, beginning around 2020. Her visits, at least at first, were to buy drugs for herself and to distribute for Andres. And she was seemingly effective: Andres told one witness that Sutton "made him $50,000 last month." J.A. 185.

Sutton and Andres's professional relationship turned romantic around the time that West moved out. This seems to have changed Sutton's role. Together, Sutton and Andres traveled to California (where Andres sourced most of his drugs) in April 2021 and bought

2

a large quantity of methamphetamine and marijuana.[1]  They smoked some of the meth at their hotel, then drove back to Virginia (while continuing to smoke) with the drugs in a puzzle box in the back of the truck.

After Andres and Sutton returned with the drugs, they began to distribute them. Enter Katherine Moore, Andres's niece and one of his dealers, who agreed to sell meth to an undercover police officer.  Moore did so three times.  First, she sold an 8-ball (1/8 of an ounce) of meth that Andres had weighed out for her from the parking lot of a hotel where she was living.  The second sale occurred a week later.  The undercover officer picked Moore up from the hotel, and they drove together to the house.  Once there, Moore walked inside alone, where Andres gave her meth that she then sold to the officer in the car.

Sutton came back into the picture for the third sale, on April 21, 2021.  Moore and Sutton spoke on the phone at 5:35 a.m. to set up the sale.  Five hours later, Sutton texted Moore, "I'm up.  He's sleeping."  J.A. 481.  Moore then drove over to the house with the undercover officer to pick up the drugs.  Sutton needed a scale to weigh the meth, and so Moore stopped by a local store called the Smoke Shack to buy one.

Moore left the undercover officer in the car, entering the house alone.  Sutton weighed the drugs and handed them over.  Moore walked back to the car, pocketing an ounce of meth for herself, and gave the undercover officer the remaining methamphetamine.  The undercover officer then gave Moore $2,700 in marked bills to pay Sutton.

---

[1] Sutton had also wired $4,200 to Andres in California.

3

Law enforcement raided the house a few hours later. As police rolled through the house, they spotted a bag of crystal meth in the master bedroom near plastic baggies used to subdivide drugs into smaller portions. Sutton had stuffed $2,400 of the marked bills into her bra. And the officers discovered the puzzle box lying on the floor in the hallway. The box had a "kind of tricky way to open it," J.A. 317–18, and held about ten pounds of marijuana inside.[2] Police also found two pistols and ammunition in the master bedroom, and an AR-15 lying on a desk in the living room.

The district court convicted Sutton in a bench trial. After sentencing, she timely appealed.

## II.    Discussion

Sutton challenges each count of her conviction on the theory that the district court lacked sufficient evidence to convict her. She also claims that her sentence is procedurally and substantively unreasonable.

### A.    Sufficient Evidence Supported Sutton's Convictions

When reviewing bench-trial convictions for sufficiency of the evidence, we must uphold each guilty verdict so long as substantial evidence supports it. *See United States v. Landersman*, 886 F.3d 393, 406 (4th Cir. 2018). "'Substantial evidence' means evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* (quoting *United States*

---

[2] One witness testified that "[i]t was like a little safe box. It was supposed to be like a puzzle box. Nobody really knew how to open it." J.A. 165.

*v. Armel*, 585 F.3d 182, 184 (4th Cir. 2009)).  In doing this review, we construe the evidence in the government's favor.  *Id.*

The government presented more than enough evidence for a reasonable factfinder to conclude that Sutton was guilty of each offense.  Only two offenses warrant explanation: possession with intent to distribute marijuana, and use of a drug-involved premises.  *See* 21 U.S.C. §§ 841(a)(1), 856(a)(1).[3]

### 1.    Sutton Constructively Possessed the Marijuana

To convict Sutton of possession of marijuana with intent to distribute under § 841(a)(1), the government had to show that (1) Sutton possessed the marijuana, (2) knowingly, and (3) with intent to distribute it.  *See United States v. Moody*, 2 F.4th 180, 189 (4th Cir. 2021) (citing *United States v. Burgos*, 94 F.3d 849, 873 (4th Cir. 1996)).  Sutton does not challenge the third, intent-to-distribute element on appeal, only possession and knowledge.

"Possession may be actual or constructive."  *Id*. (cleaned up).  While actual possession requires physical control of the contraband, constructive possession can be established by showing "ownership, dominion, or control over the contraband or the

---

[3] It is worth pointing out that these two offenses had little effect on Sutton's sentence, given the significance of her uncontestable drug-conspiracy and firearm convictions.  But a hallmark of our system of justice is that guilt must be proven.  And our Founders believed that "it is better a hundred guilty persons should escape than one innocent person should suffer."  Alexander Volokh, n *Guilty Men*, 146 U. Pa. L. Rev. 173, 175 (1997) (quoting Letter from Benjamin Franklin to Benjamin Vaughan (Mar. 14, 1785), *in* 11 *The Works of Benjamin Franklin* 11, 13 (John Bigelow ed., fed. ed. 1904)).  The idea that Sutton would be punished, even in the slightest way, for an unproven crime is repugnant to principles on which our nation was built.  So we address these convictions.

premises . . . in which the contraband was concealed," along with "knowledge of the presence of the contraband." *Id.* (quoting *United States v. Herder*, 594 F.3d 352, 358 (4th Cir. 2010)). "Because constructive possession requires knowledge of [the] contraband, the same evidence that establishes constructive possession . . . will establish the first and second elements of § 841(a)(1)." *Id.* at 189–90.

There was sufficient evidence to determine that Sutton constructively possessed the ten pounds of marijuana hidden in the puzzle box. Witnesses testified that Sutton had long sold drugs for Andres, who owned the marijuana. This suggests that Sutton exercised some level of dominion or control over the drugs in the Norfolk home. And she was physically present in the house with marked bills from her earlier meth sale when the marijuana was found. *See Moody*, 2 F.4th at 190 (noting that proximity is evidence of constructive possession). As for knowledge of the marijuana's presence, it was purchased during Sutton's trip to California with Andres, along with the meth she later sold. So it doesn't strain the imagination to conclude she knew about the drugs.

In her defense, Sutton argues that the government failed to meet its burden because it produced no evidence that she knew how to open the puzzle box, which was, somewhat like a combination safe, "tricky" to open. She insists that, without proof she could open the box, the government necessarily failed to prove she had knowledge of and control over its contents.

6

We disagree.  While there was no direct evidence proving Sutton knew how to open the box, the evidence did not compel the judge to conclude that she couldn't.[4]  Some testimony suggested that Andres knew how to open the box.  But this does not show that *only* Andres knew.  That a safe has a combination lock doesn't mean only a single person can open it.  Many people could know the code.  Taking things in the light most favorable to the government, as we must, this record does not require a conclusion that Sutton could not open the box.  [*See* J.A. 77; J.A. 165; J.A. 205; J.A. 314; J.A. 318; J.A. 324; J.A. 328.]

And there is other evidence.  Sutton was with Andres in California when the marijuana was purchased and the puzzle box was used.  She maintained a romantic relationship with Andres, who knew how to open the box.  And Andres trusted her to deal drugs on his behalf from his Norfolk home.  Sutton's involvement in the drug trafficking at the residence, plus her history with the box's contents and proximity to the container for a long time, allowed a reasonable factfinder to find constructive possession.  *See United States v. Gallimore*, 247 F.3d 134, 137 (4th Cir. 2001) (finding constructive possession of items in a safe); *Moody*, 2 F.4th at 192–93 (finding proximity, physical movement, and access sufficient to establish constructive possession of hidden firearms).

We therefore conclude that the government presented sufficient evidence for a reasonable factfinder to convict Sutton of possession of marijuana with intent to distribute.

---

[4] Because the record does not require finding that she could not open the box, we need not address whether that fact would preclude finding that she exercised constructive possession over the marijuana in the box.

7

### 2. Sutton "Used" the House "For the Purpose Of" Distributing Drugs

Sutton was also convicted under 21 U.S.C. § 856(a)(1), which makes it unlawful to "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance." Sutton contends that too little evidence supported her conviction because she did not live at the house. But the statute's reference to the "use" of a place simply requires its active employment. This capacious definition covers Sutton's actions at the house during her romantic involvement with Andres, regardless of whether she lived there. And given Sutton's participation in distributing meth from the house, one of Sutton's specific uses of the house was "for the purpose of" drug distribution. So a factfinder could reasonably have concluded that Sutton "use[d]" the house "for the purpose of . . . distributing" methamphetamine under § 856(a)(1).

To explain that conclusion, we start, as always, with the statutory text. The operative word is "use," and because "use" is neither statutorily defined nor a term with an established common-law meaning, we construe it in accordance with its ordinary meaning at the time of the statute's enactment. *See, e.g.*, *Chapman v. United States*, 500 U.S. 453, 461–62 (1991). Dictionaries contemporaneous with the 2003 amendment[5] to § 856(a)(1)

---

[5] Until 2003, § 856(a)(1) only made it unlawful to "knowingly open or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance." Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, sec. 1841, § 416(a)(1), 100 Stat. 3207, 3207-52. In 2003, § 856(a)(1) was amended to its current form, adding the word "use," among other changes. Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003, Pub. L. No. 108-21, § 608(b)(1), 117 Stat. 650, 691.

8

define the verb form of "use" as "to employ for some purpose; put into service." *Use*, *Webster's New Universal Unabridged Dictionary* (2003); *see also Use*, *Collins English Dictionary: Complete and Unabridged* (6th ed. 2003) ("[T]o put into service or action; employ for a given purpose.").

The definitions make immediately clear that the ordinary meaning of "use" sweeps broadly. On its face, this poses an issue for Sutton, who seeks to limit "use" to something akin to "live or reside at." Though people may most commonly "use" a "place" like a house as a permanent residence, the words "live" and "reside" "appear nowhere in the statute." *Smith v. United States*, 508 U.S. 223, 229 (1993). "Had Congress intended the narrow construction . . . it could have so indicated." *Id.* Instead, Congress chose language in § 856(a)(1) that is far more capacious than "live" or "reside." One can "use" a house for other reasons, including running a business. This signals that we should hesitate to "introduce that additional requirement on our own." *Id.*

Even so, the dictionary definition of "use" does not completely settle the question. The Supreme Court has "observed more than once" that "the word 'use' poses some interpretational difficulties because of the different meanings attributable to it." *Dubin v. United States*, 599 U.S. 110, 118 (2023) (quotation omitted); *see id.* at 124 ("'uses' is indeterminate in isolation"). Because of this indeterminacy, the Supreme Court directs that we "look not only to the word itself, but also to the statute and the surrounding scheme, to determine the meaning Congress intended." *Id.* (quoting *Bailey v. United States*, 516 U.S. 137, 143 (1995)) (cleaned up).

9

The remaining verbs surrounding "use" in § 856(a)(1) indeed suggest that we must shrink the scope of "use" slightly from its full dictionary sweep. Unbounded, "use" might render superfluous § 856(a)(1)'s other verbs—"open, lease, rent, . . . [and] maintain." This is because "use," as defined in the dictionary, could subsume "lease," "rent," and "maintain." Read for all it's worth, this definition covers *every* way someone might put a place into service. To see why this sweeps too far, consider a warehouse owner who "opens" a storage business and "leases" space to customers—and consider too the customers who "rent" space and "maintain" their rentals over time. No doubt, the lessor and lessees alike have put the warehouse into service and thus used it within the dictionary definition. But courts usually assume "that Congress used [multiple] terms because it intended each term to have a particular, nonsuperfluous meaning." *Bailey*, 516 U.S. at 146. And our "resistance" to surplusage "should be heightened when the words describe an element of a criminal offense." *Id.* at 145 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 140–41 (1994)).[6] Therefore, we search for a more limited interpretation of "use."

---

[6] It is true that Congress often legislates in a "belt and suspenders" manner. But when interpreting "use" in criminal statutes the Court has repeatedly "assume[d] that Congress used [multiple] terms because it intended each term to [] have a particular, nonsuperfluous meaning." *Dubin*, 599 U.S. at 126 (quoting *Bailey*, 516 U.S. at 146). On its face, the list of verbs "transfer, possess, or use" in the aggravated-identity-theft statute considered in *Dubin* could be understood as a belt-and-suspenders list to capture basically anything done "without lawful authority" with another's means of identification. And yet *Dubin* did not adopt that reading. The Court rejected such a "boundless" interpretation for a "narrow" one that allowed each verb to function independently. *Id.* at 128, 126; *see also Bailey*, 516 U.S. at 146 ("Nothing here indicates that Congress, when it provided these two terms, intended that they be understood to be redundant.").

10

Fortunately, the Supreme Court provided another fitting interpretation when resolving a similar superfluity problem in *Bailey*: "use" connotes the "active employment" of, rather than the inactive employment of, a thing. *Bailey* considered "use" in 18 U.S.C. § 924(c)(1), which increases the punishment for "crime[s] of violence" and "drug trafficking crime[s]" if the defendant also "uses or carries a firearm." To avoid making the passive "carr[ying]" of a firearm superfluous, the Court limited "use" to the "*active employment*" of the firearm, as distinct from any "ongoing, inactive function" that a firearm might play. *Bailey*, 516 U.S. at 148–49 (emphasis added). The Court did not restrict the "use" of a firearm to its most common application of "firing or attempting to fire a firearm." *Id.* at 148. Instead, "active employment" included "brandishing, displaying, bartering, [and] striking with" a firearm as well. *Id.* But the definition excluded merely having an undisclosed firearm at the ready, even though we might say colloquially that someone who keeps a firearm in close proximity "uses" it to embolden himself. *Id.*

Though a polysemous word like "use" must be interpreted individually in each statute, we will not reinvent the wheel when we need not do so: *Bailey*'s definition of "use" as "active employment" neatly fits 21 U.S.C. § 856(a)(1). We are in good company in adopting *Bailey*'s "active employment" definition too. In *Jones v. United States*, 529 U.S. 848 (2000), the Supreme Court imported *Bailey*'s definition into 18 U.S.C. § 844(i), the federal arson statute. That statute criminalizes the destruction "by means of fire or an explosive, any . . . property *used* in interstate or foreign commerce." § 844(i) (emphasis added). The government argued in *Jones* that even a private home could satisfy § 844(i) by being "used . . . in commerce" "as collateral to obtain and secure a mortgage," as the

11

subject of "a casualty insurance policy," or by "receiv[ing] natural gas." *Id.* at 855. But the Court rejected these three examples. Instead, it held that because "the word 'use,' in legislation as in conversation, ordinarily signifies 'active employment,'" § 844(i)'s requirement that a property be "used in . . . commerce" excluded properties that had only a "passive, passing, or past connection to commerce." *Id.* (quoting *Bailey*, 516 U.S. at 143, 145)). So the mere inactive or indirect employment of a property as a financial instrument or resource receptacle did not place a private home within the statute's ambit. *Id.* at 856. Following the Supreme Court's example, we conclude that the "use" of a "place" in 21 U.S.C. § 856(a)(1) also requires its "active employment"—and excludes merely "passive, passing, or past" availment. *Id.* at 855.

This narrower "active employment" definition quells any superfluity concerns generated by an expansive definition of "use." The verbs "lease," "rent," and "maintain" in § 856(a)(1) can all be performed as "passive, passing, or past" functions. Consider the following sentence, which makes plain the active-passive distinction: "I am renting a vacation home in Maine and will be maintaining it through next summer, but I won't be using it this weekend." "Renting" and "maintaining" can be understood as separate ways of establishing some ongoing, passive financial relation (leasehold ownership) between the speaker and the vacation home. The same goes for "leasing," which is the mirror action of "renting." But merely having some ownership over a vacation home, without more, would not generally be understood as actively employing it. Active employment would require something like spending time at the home—i.e., actually *using* it. Reading "use" to exclude passive employment thus affords independent meaning to each of these verbs.

12

This reading likewise makes sense of § 856(a)(1)'s remaining verb, "open."[7] True, "open" is unique among the four non-use verbs in that it doesn't suggest an ongoing, passive relationship. Rather than passively own a place, one must actively "open" it for business. *See Open, Webster's Third New International Dictionary* (1986) ("[T]o make available for or active in a regular function."). But opening a place wouldn't be understood as "actively employing" it. Instead, the opening necessarily precedes the employment—making it a "past" relationship. One must "open" a restaurant before "actively employing" it to make and sell food, "open" a bank before "actively employing" it to store and lend funds, and "open" a park before "actively employing" it to camp and hike. While "open" and "use" are both active, "open" precedes "use." Our interpretation of "use," then, does not render superfluous any of the words in § 856(a)(1).

In sum, § 856(a)(1)'s list of verbs covers three types of conduct: the initial opening of a place; passive but ongoing functions of a place like leasing, renting, and maintaining it; and the active employment of a place like living or conducting business in it. This understanding of the statute gives each verb independent force.

And though "active employment" is broad, "[w]e are not persuaded that our construction of the phrase 'uses . . . [any place]' will produce anomalous applications." *Smith*, 508 U.S. at 232. For starters, the definition already excludes all "passive, passing, or past" employment. *Jones*, 529 U.S. at 855. Additionally, the scope of § 856(a)(1) depends not just on the meaning of "use," but also the phrases that surround "use." *See id.*

---

[7] The word "open," unlike the word "use," appeared in the first version of § 856 back in 1986. *See* Anti-Drug Abuse Act sec. 1841, § 416(a)(1).

13

(accepting a broad definition of "use" because of the constraints imposed by the separate phrase "during and in relation to").  Like § 924(c) in *Smith*, § 856(a)(1) requires not just use but something more:  that the defendant use a place "for the purpose of" drugs.  Our precedents acknowledge that this phrase sets guardrails around § 856(a)(1).  In *United States v. Hicks*, we concluded that although the phrase "for the purpose of" does not require that drugs be the "sole purpose" of that place, it "must be one of the defendant's *specific* purposes," not just "incidental."  64 F.4th 546, 551 (4th Cir. 2023) (emphasis added).  As a result, § 856(a)(1) does not reach so far as to "criminalize a person's casual drug use at home."  *Id.*  Such personal consumption, we suggested, would be "'merely incidental' to [the] residential purpose for the home," and § 856(a)(1) does not cover merely incidental purposes.  *Id.* (quoting *United States v. Russell*, 595 F.3d 633, 642–643 (6th Cir. 2010)).

Together, the "active employment" definition of "use" and the exclusion of incidental purpose jointly restrict § 856(a)(1)'s reach to situations in which there can fairly be said to exist, as the title of the statute states, a "drug-involved premises."  *Cf. Dubin*, 599 U.S. 110, 120–21 (taking the title of the aggravated identity theft statute into account when interpreting the word "uses").  Because our interpretation of "use" both requires active employment *and* is limited by the surrounding, "purpose of" language, some substantial involvement of the house is required.[8]

---

[8] Other portions of § 856(a)(1) have not yet been interpreted by this Court.  It remains an open question, for example, what sorts of property or structures are covered by "any place," or how long a place must be used to qualify as "temporar[y]" usage.  Those portions of the statute may constrain the scope of § 856(a)(1).  But we have no occasion to address such questions now.

14

To be sure, though more restrained than it could be, our interpretation of "use" as the "active employment" of a place still covers a wide range of conduct. As in *Bailey*, where the "active employment" of a firearm went beyond the prototypical function of a gun as a ranged weapon, so too here does the "active employment" of a place such as a house extend beyond its prototypical function as a residence. When, for example, a drug operation is run out of a house that is rented and maintained by a single high-level cartel member, lower-level dealers who portion out the drugs at the kitchen table and meet purchasers in the foyer for sales could still be charged under § 856(a)(1). They have doubtless "actively employed" the house in their dealings, even though none of them lives or resides there.

Armed with this understanding, Sutton's case is straightforward. Whether or not she lived at the house, Sutton actively employed it because she received supplies of meth to sell from the house, and even arranged to sell meth to an undercover from inside the house in April 2021. Far from holding a merely passive or passing relationship to the house, she repeatedly took advantage of its capacity as a place of shelter, storage, and business. Nothing more was needed for Sutton to "use" the house.

Nor was Sutton's use of the house "for the purpose of" drug distribution merely incidental. The house was Sutton and Andres's base of operations, serving as the all-in-one place where meth was stored in bulk, divvied up into baggies, and sold to customers. During the last controlled purchase, Sutton invited Moore in, retrieved meth from a black bag stored in the master bedroom, weighed out the requested quantity, and traded the meth for $2,700—all within the house, and all while Andres was sleeping. The evidence

15

therefore easily permitted the district court to conclude that Sutton herself (1) knowingly (2) "used" the house (3) "for the purpose of" distributing controlled substances under § 856(a)(1).

None of this is to deny that hard calls will exist at the fuzzy boundary between the active employment of a place and the merely passive or incidental involvement of a place for drug operations. But this is not one of those hard calls. So we leave the tougher, marginal questions for another day.

### B.      Sutton's Sentence Was Neither Procedurally Nor Substantively Unreasonable

Sutton also challenges her sentence as procedurally and substantively unreasonable. We review the district court's findings of fact for clear error and its sentencing decisions for abuse of discretion. *United States v. McCabe*, 103 F.4th 259, 285 (4th Cir. 2024). We consider Sutton's procedural unreasonableness and substantive unreasonableness challenges in that order, concluding that the District Court did not abuse its discretion.

*First*, her procedural unreasonableness claims. Sutton argues that the district court erred when it denied her request for an acceptance-of-responsibility reduction. But the Sentencing Guidelines Applications Notes state that only in "rare situations" will the reduction apply to a defendant who proceeds to trial, such as when the defendant admits factual guilt but goes to trial to preserve a legal issue for appeal.[9] Here, Sutton denied

---

[9] The Notes explain that the acceptance-of-responsibility reduction could apply when a defendant went to trial, for example, "to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct[]." U.S.S.G. § 3E1.1 cmt. n.2. However, it counsels that in these situations the defendant's "pretrial statements and (Continued)

factual guilt and proceeded to trial, only seeking to accept responsibility after conviction. So the district court did not abuse its discretion.

Sutton also claims that the District Court should have applied the minor-role reduction to her sentence. *See* U.S.S.G. § 3B1.2. But a reasonable judge could view the evidence presented at trial and conclude that she was not "plainly among the least culpable" of those involved in the crime or that she "lack[ed] . . . knowledge or understanding of the scope and structure of the enterprise and of the activities of others." U.S.S.G. § 3B1.2 cmt. n.4; *see also id.* at cmt. n.3(C). After all, the evidence allowed a factfinder to conclude that she coordinated a drug transaction and participated in purchasing a bulk supply of controlled substances on the California trip. So the district court did not abuse its discretion in refusing to apply this reduction either.

*Second*, Sutton's substantive unreasonableness claims. She argues that her sentence was greater than necessary to achieve the purposes of sentencing, given her distressing childhood, history of mental illness, and drug abuse. This is a difficult argument to make, as a sentence that falls *within* the Guidelines range is already "presumptively reasonable." *United States v. White*, 850 F.3d 667, 674 (4th Cir. 2017). In this case, Sutton's sentence of 348 months is *below* the Guidelines range minimum of 420 months (360 months plus 60 consecutive months). So on its face, Sutton's challenge, without more, fails. And at any rate, the district court explicitly considered Sutton's background and history, along

---

conduct" will be the primary basis for determining whether they have accepted responsibility. *Id.* Here, it was only after trial (and conviction) that Sutton admitted her involvement in the scheme; her pre-trial statements and conduct do not demonstrate acceptance of responsibility.

with the other § 3553(a) factors, when it determined her sentence. We thus conclude that Sutton's sentence was reasonable under the circumstances.

Sutton also argues that her sentence was unfair when compared to Moore's sentence and West's immunity. But both Moore and West cooperated with the government. Moore pleaded guilty and testified. West also agreed to testify, receiving immunity for her cooperation. We would generally expect defendants who plead guilty and cooperate to receive lower sentences than their counterparts who go to trial. *See United States v. Jeffery*, 631 F.3d 669, 679 (4th Cir. 2011) ("[D]efendants who cooperate with the government and enter a written plea agreement are not similarly situated to a defendant who provides no assistance to the government and proceeds to trial." (quoting *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009))). We therefore do not find Sutton's sentence substantively unreasonable based on an asserted disparity.

\*          \*          \*

Not every business relationship turns into a romantic one. And no matter how ill-advised, not every transgression leads, like this one, to criminal liability. But when that romance mixes with drugs and guns, hefty prison sentences can follow. We hold that sufficient evidence supported Margaret Sutton's convictions and find her sentence to be neither substantively nor procedurally unreasonable. Accordingly, the district court's decision must be

AFFIRMED.

18