**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-4070**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

SAUNDRA LUCILLE WHITE, a/k/a Lucille Parrish-White, a/k/a L. Saundra White, a/k/a L. Saundra Parrish White, a/k/a Lucille S. White, a/k/a Lucille P. White, a/k/a Lucille Parrish, a/k/a Saundra L. Parrish,

Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Paul W. Grimm, District Judge. (8:13-cr-00436-PWG-1)

Argued: January 25, 2017                                     Decided: March 9, 2017

Before DUNCAN and KEENAN, Circuit Judges, and DAVIS, Senior Circuit Judge.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Keenan and Senior Judge Davis joined.

**ARGUED:** Alex Christian Gesch, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellant. James I. Pearce, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Baltimore, Maryland, Meghan S. Skelton, Appellate Attorney, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland; Mark A. Perry, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellant. Leslie R. Caldwell,

Assistant Attorney General, Sung-Hee Suh, Deputy Assistant Attorney General, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, Sujit Raman, Chief of Appeals, Thomas P. Windom, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

DUNCAN, Circuit Judge:

Defendant-Appellant Saundra Lucille White ("White") appeals her convictions for mail fraud, wire fraud, money laundering, and aggravated identity theft. White contends that she should have received a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to challenge the veracity of the affidavit supporting a search warrant authorizing a search of her residence. White also appeals the reasonableness of her sentence. For the reasons that follow, we affirm.

I.

A.

On December 26, 2009, Christal Millner suffered a severe stroke leaving her unable to walk, talk, or drive for the remainder of her life. Pamela Hiler, Millner's cousin, took responsibility for Millner's care. In March 2010, hospital staff advised Hiler to seek guardianship of Millner in order to make health care and other decisions on Millner's behalf. Hiler, a counselor, reached out to White for assistance. White and Hiler had attended the same church for many years and Hiler recalled that White was an attorney. White graduated from Texas Southern University School of Law in 1983 and obtained a Master of Law in Taxation from Georgetown University in 1989. Hiler retained White on March 24, 2010 and received temporary and then permanent guardianship over Millner.

As part of the guardianship process, Hiler and White inventoried Millner's assets. These included Millner's condominium in Silver Spring, Maryland, a 1993 Volvo, and

3

three Bank of America accounts totaling over $130,000. Millner also had access to her deceased mother's assets, including bank accounts totaling $352,000, approximately $400,000 in savings bonds, and a house. Hiler set about trying to organize Millner's personal affairs and gave White a key to Millner's condo.

Almost immediately after Hiler retained White, White began a scheme to defraud Hiler and Millner. In April 2010, White impersonated Millner to apply for a duplicate license in Millner's name at a Maryland Motor Vehicle Administration ("MVA") location. White used Millner's birth certificate and forged Millner's signature on the application. Because White did not look like the prior photographs of Millner in the MVA database, the MVA confiscated the license. Undeterred, White obtained a counterfeit university identification with White's picture and Millner's name.

In June 2010, White created a Maryland entity called Intel Realty Financial Services ("IRFS"). White opened a bank account for IRFS at Wachovia Bank, listing Millner as IRFS's CEO, owner, and president. The registered address of the bank account was a P.O. Box that White had previously opened. Using the fake university identification and Millner's vehicle registration, White then rented another P.O. Box in Millner's name from UPS. White authorized Millner and IRFS to receive mail from the UPS box.

Shortly thereafter, Millner received the first of many tax deficiency notices. Because Millner was bedridden in a medical facility, Hiler routinely went to Millner's condo to retrieve the mail. In June 2010, Hiler opened a letter addressed to Millner and Millner's mother purportedly from the "IRS, Department of Treasury, Internal Revenue

4

Service." J.A. 1163. The letter referred to an "Offer Compromised Agreement" between Millner and the IRS and requested remittance of $158,500 to IRFS. J.A. 1165. It warned that the office would "file an immediate lien on any and all of" Millner's assets unless the agency received "full and complete payment" by June 19, 2010. J.A. 1165. Hiler asked White, her attorney, to call the number on the notice to ascertain whether it was legitimate and to confirm that Millner actually owed the money. After assuring Hiler that she had looked into the matter and Millner did owe the money, White told Hiler to send the checks on Millner's behalf. Hiler purchased cashier's checks drawn on Millner's account and sent them to IRFS. From June 2010 until early 2013, Millner continued to receive similar tax notices and Hiler continued to send IRFS money from Millner's accounts. Even after Millner died in January 2011, the tax notices continued.

By the end of 2012, the IRFS payments had depleted Millner's assets. Hiler then received a notice addressed to her stating that she, as Millner's personal representative, was responsible for paying the taxes. In addition, Hiler received a voicemail from an unidentified caller purporting to be "an official collector for" the IRS and the "State of Maryland Department of Revenue."[1] J.A. 2354. The caller instructed Hiler or her attorney to contact the office that day and left a return number. When Hiler consulted White as to these notices, White confirmed that Hiler was responsible for paying the taxes and advised that she borrow money to do so. Having sent IRFS approximately

[1] Maryland's tax authority is the Office of the Comptroller of Maryland, not the Department of Revenue.

5

$800,000 at this point, Hiler became suspicious. She consulted another attorney, Craig Ellis, who told Hiler that the notices were "absolutely crazy" because an estate representative generally is not liable for the debts of the estate. J.A. 1360. Ellis, now also suspicious, did a quick internet search of White. He found out that, unbeknown to Hiler, White had been disbarred in Washington, D.C. and Maryland since 2011 and was not currently licensed to practice law.

### B.

Ellis contacted the Fraud Section of the Anne Arundel County, Maryland Police Department, which sparked a state and federal investigation of White's conduct. Law enforcement learned that after Hiler wrote checks to IRFS, White deposited the checks into the IRFS bank account. White then forged Millner's names on checks out of the IRFS account to herself, her daughter, trust fund accounts, to purchase vehicles, and to renovate property White owned.

On May 15, 2013, John Davids, Special Agent with the United States Treasury Inspector General for Tax Administration, submitted a sworn affidavit in support of an application for a search and seizure warrant for White's office and residence. The affidavit described White's scheme, including the fraudulent tax notices, the IRFS P.O. Box and bank account opened by someone claiming to be Millner, ATM photographs of White making deposits and withdrawals into the IRFS bank account, and the forged checks from the IRFS account. As to probable cause, Davids relied on his interview with Hiler and his twenty-five years of experience as a Special Agent. According to Davids, Hiler met White at White's office "for meetings that were directly

6

related to this scheme." J.A. 32. Davids also attested that Hiler told him she "has been present at White's home and had discussions related to this scheme there." J.A. 32. A magistrate judge issued the search warrant, which agents executed on May 17, 2013.

The search uncovered a bevy of incriminating evidence, including debit cards for the IRFS bank account, an envelope on which White had been practicing Millner's signature, draft notices to Millner with the IRS seal cut and pasted onto them, mail from the IRFS P.O. Box, the counterfeit university identification card, and several of the cashier's checks Hiler had sent to IRFS. Agents also found carbon copies of forged checks from the IRFS account to White, White's daughter, White's family trust, car dealerships for cars White purchased, and a contractor for construction work on White's property.

## C.

On September 15, 2014, a superseding indictment charged White with three counts of mail fraud in violation of 18 U.S.C. § 1341; one count of wire fraud in violation of 18 U.S.C. § 1343; two counts of money laundering in violation of 18 U.S.C. §§ 1956(a), 1957; and one count of aggravated identity theft in violation of 18 U.S.C. § 1028A. White pleaded not guilty, and the district court released her pending trial. On October 14, 2014, the government filed a motion seeking White's pretrial detention, alleging that White violated the terms of her pretrial release by defrauding another victim and opening another bank account without prior approval. Accordingly, the court ordered White detained pending trial, which began in July 2015.

7

Hiler was the government's first witness. On cross-examination, Hiler testified that she did not have "any formal business meetings" at White's home and only went to White's home on "social occasions." J.A. 1315. White immediately requested a *Franks* hearing, arguing that the primary bases for the warrant were Hiler's statements to Davids that she had been to White's home and discussed business--specifically Millner--with White at White's home. On redirect, Hiler clarified that she did not recall "having a full detailed conversation" with White about Millner at White's home but that she may have communicated with White "in passing" about Millner's health. J.A. 1341. Hiler also reiterated that she knew White had a home office but had never been inside of it. After excusing Hiler and the jury, the district court heard arguments and determined that White was not entitled to a *Franks* hearing.

The jury convicted White on all seven counts. At sentencing, the district court applied several sentencing enhancements, two of which are at issue here. Over White's objection, the district court added a two-level enhancement for misrepresentation of a government agency pursuant to U.S.S.G. § 2B1.1(b)(9)(A) and an additional two-level enhancement for sophisticated means under § 2B1.1(b)(10)(C). The district court also denied White's request for a downward departure based on her psychologist Dr. Michael Hendricks's diagnosis of ███████████████████████████. Upon the government's motion, the district court ordered Dr. Neil Blumberg to conduct a psychiatric examination of White. Dr. Blumberg's report contradicted Dr. Hendricks's conclusion, finding that the ████ diagnosis was "questionable at best" because the ████ examination was self-reported and had no built-in validity scales. J.A. 2607. Further,

8

Dr. Blumberg's own examination revealed "█████████████████████████████ ███████." J.A. 2608.

At sentencing, the district court weighed the competing expert reports and found Dr. Blumberg's analysis more compelling. The district court calculated White's Guidelines range for Counts 1 to 6 as 87 to 108 months and sentenced White to 108 months. Count 7 carried a mandatory consecutive 24-month sentence, making White's total sentence 132 months. White timely appealed the district court's denial of a *Franks* hearing and her sentence.

## II.

White argues that she was entitled to a *Franks* hearing because Hiler's testimony called into question the validity of the warrant. The government argues that White waived this argument by not making the request before trial and, even if the argument is not waived, White does not meet the standard for a *Franks* hearing. "We assess de novo the legal determinations underlying a district court's suppression rulings, including the denial of a *Franks* hearing, and we review the court's factual findings relating to such rulings for clear error." *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011).

### A.

In *Franks v. Delaware*, the Supreme Court carved out a narrow exception to the general rule prohibiting a defendant from attacking a facially valid affidavit. 438 U.S. at 171. Although we typically describe the *Franks* test as two-pronged, it actually has three parts. To obtain a *Franks* hearing, a defendant must make a "substantial

9

preliminary showing" that the affiant made (1) a false statement (2) "knowingly and intentionally, or with reckless disregard for the truth" that was (3) "necessary to the finding of probable cause." *Id.* at 155–56.

Before turning to the substance of White's claim, we must first address the government's threshold argument that White failed to preserve her *Franks* hearing challenge because she did not make the request prior to trial. Federal Rule of Criminal Procedure 12(b) requires defendants to make suppression requests, like a *Franks* hearing, before trial "if the basis for the motion is then reasonably available." Fed. R. Crim. P. 12(b)(3). The basis for White's *Franks* hearing request was Hiler's testimony, which White believes contradicted statements in the affidavit. Because that information was not "reasonably available" before trial, *id.*, White did not waive her right to request a *Franks* hearing.

Nevertheless, White's *Franks* claim fails on the merits because she did not make a substantial showing that Agent Davids knowingly, intentionally or with reckless disregard made a false statement in the affidavit. The affidavit stated that Hiler had been to White's home, "discussed this case with her there and knows her to maintain a home office at that location." J.A. 31. At trial, White's counsel asked Hiler a series of questions on cross-examination regarding her interactions at White's home.

> Q: We were talking about the times when you've been to her house. They were social occasions?
> A: Yes.
> Q: Or holiday occasions, right? These weren't times where you talked business?
> A: No.

10

Q: You didn't have any formal business meetings at Ms. White's house?

A: No.

Q: So you never claimed to Agent Davids that you discussed business at Ms. White's house?

A: No.

J.A. 1314–15. Based on those answers, White immediately requested a *Franks* hearing. The district court first allowed Hiler to finish her testimony. On redirect, Hiler clarified that she had seen White's home office before, though she had never been inside of the room. The government also asked Hiler whether she had ever discussed Millner with White at her home. Hiler responded that she did not "recall . . . having a full detailed conversation" with White about Millner but they may have discussed Millner's healthcare "in passing" at White's home. J.A. 1341.

Outside of the presence of the witness and the jury, the district court heard arguments and found that Hiler's statements did not satisfy the requisite showing for a *Franks* hearing because "at best" Hiler's testimony evinced "inconsistent versions with varying degrees of certainty . . . about communications that occurred" over two years prior. J.A. 1517. Moreover, the affidavit also cited Agent Davids's "training and experience that persons operating fraudulent schemes . . . often transport[] and store[] evidence, fruits and instrumentalities of the crime from the office to the home and vice versa." J.A. 31–32. Agent Davids attested to his knowledge "from training and experience that in this modern technological environment, many times the line between office, home and vehicle is often blurred because of technology that allows persons to be mobile in their endeavors." J.A. 32. Therefore, even without Hiler's statements, the

11

district court concluded that probable cause existed for the search warrant of White's home.

B.

The district court did not err in finding that White failed to make the requisite showing for a *Franks* hearing. First, White cannot point to a false statement. Hiler's trial testimony did not contradict Agent Davids's assertions that (1) Hiler discussed Millner with White at her home and (2) Hiler knew White had a home office from which she conducted business. Hiler's acknowledgment on redirect that she had conversations regarding Millner with White at White's home--no matter how fleeting--comport with Agent Davids's statements in the affidavit.

Second, White cannot establish the requisite scienter under *Franks*. Because the *Franks* test is from the perspective of the *affiant*, White must show that Agent Davids "knowingly and intentionally, or with reckless disregard for the truth" included those statements in his affidavit. *Franks*, 438 U.S. at 155. White asserts Agent Davids attributed statements to Hiler that she did not make, which is unlikely to have been an innocent mistake. However, a defendant's showing for a *Franks* hearing "must be more than conclusory." *Id.* at 171. White did not offer any proof showing that Agent Davids intentionally or recklessly included a false statement in the affidavit.[2] Therefore, the district court did not err in denying White a *Franks* hearing.

---

[2] Because we conclude that White did not show that Agent Davids recklessly included a false statement in the affidavit, we need not address whether the challenged statements were necessary for the magistrate judge to find probable cause.

III.

We now turn to White's challenges to the reasonableness of her sentence. White argues that the district court erred in applying (1) a two-level enhancement for misrepresenting a government agency and (2) a two-level enhancement for sophisticated means. White also contends that the district court should have reduced her sentence based on her ███ diagnosis. We discuss each argument in turn.

A.

When reviewing a criminal sentence, we first ensure that the district court did not commit significant procedural error, such as incorrectly calculating the Guidelines range. *Gall v. United States*, 552 U.S. 38, 51 (2007). We review the district court's factual findings for clear error and legal conclusions de novo. *United States v. Strieper*, 666 F.3d 288, 292 (4th Cir. 2012). If there is no procedural error, we review the substantive reasonableness of a sentence for abuse of discretion. *Gall*, 552 U.S. at 51. A within-Guidelines range sentence is presumptively reasonable. *United States v. Susi*, 674 F.3d 278, 289 (4th Cir. 2012).

B.

1.

The Sentencing Guidelines allow a district court to enhance a sentence by two levels when a fraud "involved a misrepresentation that the defendant was acting on behalf of . . . a government agency." U.S.S.G. § 2B1.1(b)(9)(A) (2014). The district court applied this enhancement to White based on two pieces of evidence: (1) the fraudulent

13

tax statements White created that induced Hiler to remit money and (2) the voicemail in which an unidentified person claimed to be an official tax collector for the U.S. Department of Treasury and the State of Maryland. The voicemail demanded payment for taxes and left a number that was later associated with White. White challenges both pieces of evidence.

White argues that the notices cannot trigger the enhancement because White did not sign her name to them or otherwise directly state that she was acting on behalf of a government taxing authority. For support, White points to the application notes for § 2B1.1(b)(9)(A), which provide three examples of when the enhancement should apply. *Id.* § 2B1.1 cmt. 8(B). White argues that these examples show that the Sentencing Commission intended the enhancement to apply only when a defendant directly and verbally misrepresents that she is acting on behalf of a government agency.

White's claim lacks merit for two reasons. First, while commentary to the Sentencing Guidelines is authoritative, we only turn to the commentary when the implicated Guideline is ambiguous. *United States v. Ashford*, 718 F.3d 377, 382 (4th Cir. 2013). Here, the Sentencing Commission was clear--the enhancement encompasses any fraud that "involved a misrepresentation." § 2B1.1(b)(9)(A). The Commission's use of the passive voice forecloses White's argument that the defendant must make a direct misrepresentation. Second, even if we consider the application note's illustrations, they do not explicitly require a direct misrepresentation. The first example involves a "defendant who solicited contributions for a non-existent famine relief organization." § 2B1.1 cmt. 8(B)(i). This example does not specify how the defendant

14

solicited money and White's behavior here is analogous: she solicited tax payments through the fraudulent IRS notices and thereby misrepresented a government agency.

White's challenge to the voicemail is equally unavailing. White argues that the voicemail cannot be attributed to her because the caller is unidentified. However, whether White is the actual person on the phone is irrelevant because the Guidelines apply to all conduct "commanded, induced, procured, or willfully caused by the defendant." § 1B1.3(a)(1)(A). The return phone number for the voicemail was a number White activated shortly after beginning the scheme, appeared on the fraudulent tax notices, and was connected to numerous documents in White's home. The district court did not commit clear error in finding that either White (in a disguised voice) or someone at White's direction made the phone call. Therefore, we affirm the district court's application of a two-level enhancement for misrepresentation of a government agency.

2.

The Guidelines also provide for a two-level sophisticated-means enhancement when a fraud involves "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." § 2B1.1 cmt. 9(B). "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities . . . also ordinarily indicates sophisticated means." *Id.* Whether a defendant's conduct involved sophisticated means is a factual inquiry that we review for clear error. *United States v. Adepoju*, 756 F.3d 250, 256 (4th Cir. 2014). The sophisticated-means enhancement "applies where the entirety of a scheme constitutes sophisticated means, even if every individual action is not sophisticated." *Id*. at 257.

15

The elaborate elements of White's scheme belie her attempt to downplay her conduct as common-place fraud. White took advantage of her relationship with a church member, Hiler, to scam approximately $800,000 from Hiler and Hiler's incapacitated and deceased family members. The calculated scheme involved several levels of fraud and spanned almost three years. To effectuate her fraud White impersonated Millner to obtain a duplicate license and counterfeit university ID. She created the fictitious entity IRFS and opened bank accounts and a P.O. Box for the entity in Millner's name. She created fraudulent IRS notices directing Hilner to pay taxes on behalf of her bedridden cousin to IRFS. White then advised Hiler, her client, to pay IRFS. White forged Millner's signature on IRFS checks to use the money in the IRFS account for herself and her daughter. Looking at the totality of the case, the district court found the evidence "sufficiently great to take this out of the mindrun [sic] of a wire fraud . . . and mail fraud case." J.A. 2373. We agree.[3] On appeal, White contends that the sophisticated-means

---

[3] White argues that we rejected the sophisticated-means enhancement based on similar facts in *Adepoju*, 756 F.3d at 250. In *Adepoju*, the defendant created counterfeit identification documents and used them to open bank accounts and deposit fraudulent checks. Contrary to White's contention, we did not hold in *Adepoju* that the scheme did not warrant a sophisticated-means enhancement. Rather, we held that the facts did not "affirmatively demonstrate" sophisticated-means evidence and the district court clearly erred by shifting to the defendant the burden to "*disprove* sophistication." *Id.* at 257 (emphasis added). The government in *Adepoju* had only carried its burden of proof as to the defendant's use of forged checks and a stolen identity to attempt bank fraud, which was not enough to place the scheme beyond the "forgeries, misrepresentation, and concealment inherent in bank fraud." *Id.* The facts here show more than simple "unauthorized acquisition and use of another's information." *Id.* In addition to impersonating Millner, White also created a fictitious entity, opened multiple bank accounts and P.O. Boxes, and created the fraudulent tax notices. The district court did not clearly err in finding that those facts, which the government proved beyond a (Continued)

enhancement is inappropriate "because of the clumsy execution of several aspects" of the scheme. Appellant's Br. at 58. But "sophisticated" under the Guidelines refers to the "especially complex or especially intricate" planning involved in a fraud, § 2B1.1 cmt. 9(B), not the skill with which a scheme is executed. The district court did not clearly err in applying a two-level enhancement for sophisticated means.

C.

Finally, turning to the substantive reasonableness of White's sentence, we must consider whether, looking at the totality of the circumstances, the district court abused its discretion in sentencing White to 108 months for Counts 1 to 6, which was the top end of the Guidelines range.[4] A district court is not required to "robotically tick through" every § 3553(a) factor but it must make an individualized assessment of the § 3553(a) factors tailored to the defendant. *United States v. Johnson*, 445 F.3d 339, 345 (4th Cir. 2006). White alleges that the district court failed to properly consider "the nature and circumstances of the offense and the history and characteristics of the defendant" as required under 18 U.S.C. § 3553(a)(1). Specifically, White believes her sentence should have been reduced based on her ███ diagnosis.

---

preponderance of the evidence, separated White's offense "from the ordinary or generic." *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012).

[4] Because Count 7 carried a mandatory 24-month consecutive sentence, the district court only had discretion as to the sentence for Counts 1 to 6.

At sentencing, the district court was faced with two competing expert reports. Post-conviction, White's expert Dr. Hendricks updated his initial evaluation of White, concluding she suffered from the more severe ███. J.A. 2541.[5] Dr. Hendricks made this new diagnosis based on conversations he had with White's friends and family after her conviction. In Dr. Hendricks's opinion, White's ███ "rendered her unable to appreciate the nature and quality of her actions or to appreciate the wrongfulness of her actions." J.A. 2537. Dr. Blumberg, the court-appointed psychologist, came to a different conclusion. Dr. Blumberg's report cast doubt on Dr. Hendricks's diagnosis because White's tests indicated "████████████████████████████." J.A. 2608. Further, Dr. Blumberg noted that the test Dr. Hendricks administered to diagnose White with ███ does not have a built-in validity scale. Therefore, "████████████ ████████████████████████████. J.A. 2607. Based on White's ████████████████, Dr. Blumberg opined that Dr. Hendricks's results were "██████████." J.A. 2607. The district court evaluated both reports and discussed them at length in the sentencing hearing. Ultimately, the district court credited Dr. Blumberg's report and found that facts and data did not sufficiently support Dr. Hendricks's belated diagnosis and that his methodology was not reliable. The district

---

[5] Prior to trial, Dr. Hendricks submitted an initial evaluation. He administered the ████████████████████████████ ("███") to White, which "is used in making a clinical diagnosis when there is a question of whether the individual meets the diagnostic criteria for ████████████." J.A. 2530. At that time, Dr. Hendricks concluded that White suffered from "████████████████████████" ("███"). J.A. 2533.

18

court amply explained its reasons for crediting Dr. Blumberg's report and did not abuse its discretion in so doing. Therefore, White has failed to rebut her presumptively reasonable sentence.

## IV.

For the reasons stated above, the judgment of the district court is

<u>AFFIRMED</u>.