**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. 16-4140

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

FATHIA-ANNA DAVIS,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., District Judge. (3:15-cr-00076-RJC-DSC-1)

Argued: March 30, 2017                                     Decided: May 1, 2017

Before SHEDD, DUNCAN, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge Shedd wrote the opinion, in which Judge Duncan and Judge Agee joined.

**ARGUED:** Jaclyn Lee DiLauro, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Anthony Joseph Enright, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Thomas P. McNamara, Federal Public Defender, Stephen C. Gordon, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Jill Westmoreland Rose, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

SHEDD, Circuit Judge:

Without knowing their true identity, Fathia-Anna Davis hired two undercover police detectives to murder her ex-husband. During the detectives' undercover investigation, Davis used her car and three mobile phones on multiple occasions to meet and communicate with them about the plot, and she eventually paid them $4,000 when they falsely told her the murder had been committed. As a result, Davis was convicted and sentenced to the 120-month statutory maximum under the federal "murder-for-hire" statute, 18 U.S.C. § 1958.[1] She now appeals, arguing that the district court erred by denying her motion to dismiss the § 1958 charge based on the "manufactured jurisdiction" doctrine and by imposing an unreasonable sentence. Finding no merit to these arguments, we affirm.

I

We first address Davis' "manufactured jurisdiction" argument. Pertinent here, § 1958 criminalizes the use of any facility of interstate or foreign commerce, including means of transportation and communication, with intent that a murder be committed for compensation. Davis moved to dismiss the charge against her based on the manufactured jurisdiction doctrine, which prohibits the government from "manipulat[ing] events to create federal jurisdiction over a case." *United States v. Al-Talib*, 55 F.3d 923, 929 (4th Cir. 1995). By invoking this doctrine, Davis essentially argues that the government failed

---

[1] The punishment under § 1958 increases depending on the harm to the victim. If, as here, the crime results in no personal injury, the statutory maximum is 10 years, but the maximum increases to 20 years if personal injury results, and to life imprisonment or death if death results.

to prove the requisite use of a facility of interstate or foreign commerce. *See United States v. Wallace*, 85 F.3d 1063, 1065-66 (2d Cir. 1996).[2] We review this matter de novo, viewing the evidence in the light most favorable to the government. *United States v. Fuertes*, 805 F.3d 485, 501-02 (4th Cir. 2015), *cert. denied*, 136 S.Ct. 1220 (2016).

## A.

The government's evidence establishes that while Davis was married to Jodi Davis ("Jodi"), she unsuccessfully attempted to kill him by putting Ambien in his food before he went to work. Davis intended for Jodi to lose consciousness while driving and die in a car crash. However, Jodi passed out from his Ambien-laced food before driving and eventually received medical care. When Davis learned that Jodi was alive in the hospital, she told her family nanny that she thought Jodi was dead, and she also described her effort to drug and kill him. The nanny later told Jodi about the drugging, and Davis fired her.

After divorcing Jodi, Davis asked her friend Huy Nguyen if he knew anyone who could kill Jodi. Davis was aware that Nguyen had previously worked for a car dealership used by gang members and drug dealers. Nguyen advised Davis not to kill Jodi and told her that he would ask someone to do so if she wanted him to.

However, Nguyen decided against helping Davis and several days later told a Charlotte-Mecklenburg Police Department ("CMPD") officer about her request.

---

[2] The government correctly notes that an interstate commerce element of a federal crime "implicates the power of Congress to regulate the conduct at issue, not the jurisdiction of the court to hear a particular case." *United States v. Carr*, 271 F.3d 172, 178 (4th Cir. 2001).

3

Subsequently, CMPD Detective Jim Hetrick met Nguyen, who agreed to assist police with an investigation. At the request of officers, Nguyen sent Davis a text message stating he had found someone to do the job for her. Through a series of cellphone conversations and text messages, Nguyen arranged for Davis to meet CMPD undercover detectives Robert Rendon and Rolando Ortiz-Trinidad. Eventually, Davis met with them on three occasions, and she drove her car to and from each meeting.

The first meeting occurred on February 15, 2015, at a shopping center. Nguyen introduced Davis to the detectives, and she got into their unmarked car. Davis used a mobile phone to show the detectives Jodi's photograph and told them that she wanted him killed. Davis then directed the detectives to Jodi's apartment complex, where she provided his address and identified his automobiles. During the meeting, the detectives asked Davis if she was certain of her intent to have Jodi killed, and she replied: "I want him out of my life. I want him out of my daughter's life. I've been trying for the last two years." J.A. 104. Davis and the detectives discussed the timing and method of the murder and agreed on a price of $4,000, with $500 to be paid up front. After the detectives and Davis returned to the shopping center, Jodi happened to pass by, and Davis pointed him out.

Three days later, on February 18, Davis placed a voice call and sent several text messages asking the detectives to call her. Although Davis had previously used two other phones to arrange the first meeting, this time she used a Tracfone, which is a prepaid phone that can be obtained without a name or credit-card information. Detective Rendon

4

returned Davis' call and arranged to meet her at the same shopping center where they previously met.

On February 22, Davis met with the detectives and gave them $500 as the down payment for the planned murder. She also displayed the remaining $3,500, which would be due after the murder. When Davis learned that the murder would not occur that day, she appeared to be disappointed. The detectives told Davis to call them if she changed her mind, but she replied that her mind was made up. When Davis overheard Detective Ortiz telling Detective Rendon to "let her know that this is final," she replied, "Yeah. I understand it's final." J.A. 168-69.

Two days later, Detective Rendon called Davis on her Tracfone, told her that they had murdered Jodi, and arranged a final meeting at a gas station for her to deliver the outstanding balance of $3,500. Of course, Jodi - who was cooperating with police - was alive and well, and to assist the operation he had temporarily stopped going to work and using his phone. Additionally, the police made Jodi's apartment look like a crime scene, complete with crime-scene tape and a marked vehicle.

Within a few minutes of the phone call, Davis met the detectives at the gas station. Because a camera monitored the premises, Davis asked the detectives to move to a different location. They drove across the street, where Davis got into the detectives' car and asked how they killed Jodi. Upon hearing their description of the murder, Davis paid the detectives $3,500. Detective Ortiz then asked Davis for her phone, but she responded that a friend was going to destroy it for her. Detective Ortiz said that he would destroy the phone, and he grabbed and broke it. Davis returned to her car and left.

5

Subsequently, CMPD officers arrested Davis. During a search incident to this arrest, officers recovered the two mobile phones that she used to set up the February 15 meeting.

B.

Davis properly acknowledges that automobiles and telephones are facilities of interstate or foreign commerce for § 1958 purposes, *see Brief for Appellant*, at 25-26, and the foregoing summary shows that the government presented abundant evidence of her frequent car and cell phone use to facilitate the murder plot. However, relying primarily on *United States v. Coates*, 949 F.2d 104 (4th Cir. 1991), Davis argues that her conviction must be vacated. In her view, when officers asked Nguyen to send a text message informing her that he found someone to kill Jodi, they improperly manufactured jurisdiction by "avail[ing] themselves of the facilities of interstate commerce in the first instance." *Brief for Appellant*, at 21. She further contends that her response to the Nguyen text message and her subsequent use of her mobile phones and car to communicate and meet with the detectives during the plot do not alter the analysis. We disagree.

In *Coates*, which involved a § 1958 conviction, we considered "whether the government can prosecute a person for arranging a murder-for-hire through the use of interstate commerce facilities, where the only basis for federal jurisdiction derives from actions the government admits were undertaken by its agents *solely* to manufacture jurisdiction." 949 F.2d at 104-05 (emphasis added). We explained that despite investigating Coates for a month, the government "had no evidence of his use of interstate mail or wire facilities in connection with the murder-for-hire scheme. To cure

6

this problem, the government agent drove to Virginia for the sole purpose of making a telephone call across state lines in order to induce Coates to 'use' that interstate facility to discuss the scheme." *Id.* at 105.[3] On appeal, Coates argued that "such 'manufactured jurisdiction' cannot form the basis for a federal prosecution." *Id.* at 106. We agreed.

We began our analysis by looking at *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973), where the court dismissed an indictment under the analogous Travel Act, 18 U.S.C. § 1952, which prohibits traveling in interstate or foreign commerce, or using the mail or any facility in interstate or foreign commerce, with intent to engage in certain illegal activity. The *Archer* court based its ruling in part on the fact that the government's agent made the necessary interstate telephone call for the sole purpose of transforming an otherwise local offense into a federal crime. The court explained that in enacting the Travel Act and similar legislation federalizing criminal conduct on the basis of its interstate connections, Congress "did not mean to include cases where the federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present." 486 F.2d at 682.[4]

---

[3] When *Coates* was decided, § 1958 required use of a facility *in* interstate or foreign commerce. Congress has since amended the statute to its current form, which requires only use of a facility *of* interstate or foreign commerce.

[4] In denying the government's rehearing petition, the *Archer* panel clarified that it "went no further than to hold that when the federal element in a prosecution under the Travel Act is furnished solely by undercover agents, a stricter standard is applicable than when the interstate or foreign activities are those of the defendants themselves." 486 F.2d at 685-86.

7

Continuing, we pointed to *United States v. Brantley*, 777 F.2d 159 (4th Cir. 1985), where we reversed a Hobbs Act conviction. Citing *Archer*, we stated that "federal agents may not manufacture jurisdiction by contrived or pretensive means," *id.* at 163, and we noted that the only involvement of interstate commerce lay in the FBI's movement of gambling machines, liquor, and money across state lines to establish a phony gambling parlor. We explained that "[i]t was wholly unnecessary for the FBI to move gambling equipment from Virginia to South Carolina, or to have its agents pretend to gamble and to purchase whiskey. We do not think the commercial predicate for federal jurisdiction can be found in such pretense on the part of federal agents." *Id.*

Applying these authorities in *Coates*, we examined the government's reasons for making the interstate phone call and concluded that "there is no doubt here that, by the government's candid admission, it was solely to create a federal crime out of a state crime." 949 F.2d at 106. We therefore held that the § 1958 count "was not based upon cognizable federal jurisdiction and should have been dismissed." *Id.* Importantly, we emphasized "the narrowness of our holding," noting that it was based "entirely on the fact that the *only* reason the sole jurisdictional link occurred here was that it was contrived by the government for that reason alone." *Id.* (emphasis in original).

Davis' reliance on *Coates* specifically, and the manufactured jurisdiction doctrine generally, is misplaced for several reasons. First, contrary to Davis' apparent contention, the manufactured jurisdiction doctrine does not categorically prohibit government agents who are conducting an undercover operation from using a facility of interstate or foreign

8

commerce to initiate contact with a suspect. Instead, it only prohibits them from doing so for the sole purpose of transforming a state crime into a federal crime.[5]

Second, on the record before us, the manufactured jurisdiction doctrine simply has no bearing. Unlike *Coates*, where the government conceded that its agent telephoned the defendant for the sole purpose of manufacturing jurisdiction, the record here is silent regarding the officers' intent in instructing Nguyen to send Davis the original text message. Cell phone usage is obviously commonplace in modern society, and it is likely that the officers asked Nguyen to text Davis because that was a convenient means of communicating with her. Although this supposition is not established in the record, it is clear that there is no evidence to suggest that the officers directed Nguyen's text solely to trigger a federal crime.

In *United States v. Brinkman*, 739 F.2d 977 (4th Cir. 1984), a Travel Act case, we considered a manufactured jurisdiction challenge based on a similarly silent - but much more suspicious - record. There, the defendant's only pertinent interstate travel occurred during an undercover operation when a government agent selected a rendezvous point with him that was 100 yards across state lines. We expressed concern about the "troubling implications" from the selection of the rendezvous point, but we rejected the

---

[5] In *United States v. Goodwin*, 854 F.2d 33 (4th Cir. 1988), government agents operating a reverse sting project initiated contact with the defendant by mail after seeing his advertisement for child pornography in an adult magazine. Relying on *Brantley*, the defendant sought reversal of his child pornography conviction on manufactured jurisdiction grounds. In affirming the conviction, we implicitly rejected the notion that government agents are prohibited from using a facility of interstate or foreign commerce to initiate contact with a suspect. *Id.* at 37 n.3.

manufactured jurisdiction defense because the record did not provide "an adequate explanation supporting a conclusion of improper purpose for the somewhat dubious turn of events." *Id.* at 982. We explained:

> To conclude that the interstate travel was indeed "manufactured," without the benefit of any explanation on the record as to the basis for the decision determining the location of the meeting, would be to assume that there was no legitimate explanation underlying the choice. We decline to operate from the premise that the government's actions were presumptively improper. . . .

*Id. Brinkman* makes it clear that the manufactured jurisdiction doctrine comes into play *only* when there is evidence to support it. Evidence of this type is lacking here.[6]

Finally, even if we accept Davis' contention that Nguyen's initial text was contrived by law enforcement officers to establish a § 1958 federal nexus, the manufactured jurisdiction doctrine still provides her no relief. Unlike *Coates*, this is simply not a case where a suspect's use of a facility of interstate or foreign commerce is a one-time direct response to a government agent's invitation. Instead, the record is replete with instances in which Davis voluntarily used her car and mobile phones to meet and communicate with the detectives regarding the murder-for-hire scheme. Each of these voluntary acts by Davis is sufficient to support her criminal culpability under § 1958, and they are not somehow tainted or discounted by Nguyen's initial text.

---

[6] In two other Travel Act cases, we found the manufactured jurisdiction doctrine to be unavailing based on the lack of evidence. *See United States v. Cooper*, 1995 Westlaw 44654, *1 (4th Cir. 1995) (noting that the defendant "could not show that the only reason" for an undercover drug deal occurring across state lines was to establish a federal crime); *United States v. Hillary*, 1988 Westlaw 118652, *3 (4th Cir. 1988) (noting that "there [was] no evidence in the record from which to conclude the interstate travel or communications were specifically manufactured to create federal jurisdiction").

## II

Having disposed of Davis' challenge to her conviction, we now consider her challenge to her sentence. Ordinarily, our review of a criminal sentence requires initial consideration of whether the district court committed significant procedural error, such as incorrectly interpreting or calculating the Guidelines range; if there is no procedural error, we then examine the substantive reasonableness of the sentence for abuse of discretion, applying a presumption of reasonableness to a sentence that is within the guidelines range. *United States v. White*, 850 F.3d 667, 674 (4th Cir. 2017).

### A.

The sentencing guideline for § 1958 is found in U.S.S.G. § 2E1.4, which provides for two possible base offense levels: 32 or, if greater, the level applicable to the underlying unlawful conduct. Here, the presentence report (PSR) cross-applied U.S.S.G. § 2A1.5, which applies to conspiracy or solicitation to commit murder, and which establishes a base offense level of 33. The PSR added four levels under § 2A1.5(b)(1) because Davis offered to pay money to the undercover detectives for the murder. Davis thus had a total offense level of 37. With a criminal history category of I, the PSR calculated Davis' advisory guideline range to be 210-262 months. However, because the statutory maximum for Davis' offense is 10 years, the PSR recommended 120 months as the guideline term. *See* U.S.S.G. § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence."). Without objection, the district court adopted this recommendation.

11

At sentencing, Davis presented several character witnesses and spoke directly to the court, and her attorney requested a downward variance sentence of time served (approximately 8 months). The gist of her presentation is that she is a good person who has learned from her mistake, and that no further incarceration is needed. Speaking as a victim, Jodi stated that Davis had made "several attempts" on his life, and he asked the court to impose the maximum sentence. J.A. 426. The government also argued for the maximum sentence. During the parties' presentation, the court expressed concern for Davis' untruthfulness and her apparent failure to accept responsibility for her criminal conduct. Ultimately, the court sentenced Davis to 10 years, stating that the sentence is sufficient, but not greater than necessary, to accomplish the sentencing factors set forth in 18 U.S.C. § 3553(a). The court noted that it had considered Davis' downward variance request and explained the necessity for a 10-year sentence under the circumstances of this case and the § 3553(a) factors, particularly the need for deterrence and protection of the public. The court also discounted the notion that Davis' attempt to kill Jodi was an aberrant act, finding that this was not the first time she attempted to kill him. The court described Davis' crime as being "cold," "calculated," and showed "real intent to kill another human being." J.A. 443.

B.

In challenging her sentence, Davis references several mitigating factors and generally asserts that the district court should have relied upon them to vary downward from the 10-year advisory range. However, the primary basis for her argument involves an attack on the operation of the guidelines. Specifically, she contends that her sentence

12

is "substantively unreasonable, and a significant portion of the blame for that belongs to the guideline that governed [her] offense of conviction." *Brief for Appellant*, at 35.

The guideline to which Davis refers is § 2E1.4 which, as noted, provides for a minimum base offense level of 32 for a § 1958 murder-for-hire offense. Pointing to the graduated penalties set forth in § 1958, Davis notes that her conviction, which involved no physical injury to Jodi, carries a 10-year maximum imprisonment term but no minimum term, and she asserts that the interplay between the guidelines and § 1958 creates an incongruity. As she explains, in cases such as hers, § 2E1.4 will always make § 2A1.5 the applicable guideline, and the base offense level will therefore always be 33.[7] Additionally, she states that because the offer or receipt of something of pecuniary value is an element of § 1958, everyone convicted under that statute will receive a four-level enhancement under § 2A1.5. "In other words, every defendant convicted under the ten-year-maximum provision of 18 U.S.C. § 1958 will have a base offense level of at least 37, just as [Davis] did, and every defendant's guideline imprisonment range will be 120 months, just as [hers] was." *Brief for Appellant*, at 38.

For this reason, Davis states that "she is challenging the reasonableness" of § 2E1.4, *Reply Brief for Appellant*, at 7, and she refers to the 10-year range in this instance as being "absurdly high" *id.* at 16, and a "perverse result[] that derive[s] from a guideline that ignores Congress's graduated punishment scheme," *Brief for Appellant*, at 40. In

---

[7] We note that other circuit courts have rejected challenges to the § 2E1.4 cross reference to § 2A1.5. *See, e.g.*, *United States v. Lisyansky*, 806 F.3d 706, 709-10 (2d Cir. 2015), *cert. denied*, 136 S.Ct. 1505 (2016); *United States v. Smith*, 755 F.3d 645, 647 (8th Cir. 2014).

Davis' view, she "should have been sentenced under a guideline consistent with the punishment provided by the statute of conviction, a guideline that provided for a *range* of punishment, and did not deny her her right to individualized sentencing." *Reply Brief for Appellant*, at 15 (emphasis in original). Seeking resentencing, she claims that "the guideline range should not serve as a 'starting point' or a 'benchmark;' the sentence should be viewed instead in relation to Congress's prescribed penalty" and with consideration of her mitigating evidence and criminal history score. *Brief for Appellant*, at 43.

Davis labels this argument as a challenge to the *substantive* reasonableness of her sentence, but we believe that it fits neatly in the category of *procedural* error. *See, e.g.*, *Molina-Martinez v. United States*, 136 S.Ct. 1338, 1345-46 (2016) ("A district court that 'improperly calculate[es]' a defendant's Guidelines range . . . has committed a 'significant procedural error.'" (citation omitted)); *United States v. Diaz-Ibarra*, 522 F.3d 343, 347 (4th Cir. 2008) ("An error in the calculation of the applicable Guidelines range, whether an error of fact or of law, infects all that follows at the sentencing proceeding, including the ultimate sentence chosen by the district court, and makes a sentence procedurally unreasonable."). However, regardless of whether the theory involves procedural or substantive error, or both, Davis did not advance it below. Certainly, her request for a downward variance based on her personal characteristics - which involves a very different analysis - was insufficient to alert the district court to the technical legal argument she now makes.

14

C.

To the extent that Davis is challenging the district court's interpretation or application of the guidelines, which is her primary argument, her failure to raise that argument below results in plain-error review. *United States v. Bennett*, 698 F.3d 194, 199-200 (4th Cir. 2012). Under this standard, our "authority to remedy [an] error . . . is strictly circumscribed." *Puckett v. United States*, 556 U.S. 129, 134 (2009). In our discretion, we may correct an error not raised in the district court only where the appellant demonstrates: (1) there is in fact an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Marcus*, 560 U.S. 258, 262 (2010).

We conclude that the district court did not err in establishing and considering 120 months as the guideline range. The guidelines are the "starting point" and "initial benchmark" for sentencing, *Beckles v. United States*, 137 S.Ct. 886, 894 (2017), and the court was required to consult them as part of the process. In doing so, the court correctly interpreted and calculated the guidelines, and properly recognized that because the advisory range (210-262 months) exceeded the statutory maximum for Davis' offense (120 months), the range became 120 months. This range is not, as Davis asserts, "absurdly high" or "perverse," it does not contravene the § 1958 graduated punishment scheme, and it did not deny Davis her right to individualized sentencing. From the 120-month "starting point," Davis was permitted to argue for a downward variance. The court

15

did not place undue weight on the guideline range, but instead gave respectful consideration to Davis' presentation and explained its reasons for denying the request in light of the facts of this case and the § 3553(a) factors. "This sort of particularized assessment is the hallmark of individualized sentencing." *United States v. Spencer*, 848 F.3d 324, 329 (4th Cir. 2017).

Even if some error lurks in this circumstance, it certainly is not plain. Our cases hold that an error is plain if (1) the explicit language of a statute or rule resolves the question or (2) at the time of appellate consideration, the settled law of the Supreme Court or this Court establishes that an error has occurred. *See United States v. Carthorne*, 726 F.3d 503, 516 (4th Cir. 2013); *United States v. Beasley*, 495 F.3d 142, 149 (4th Cir. 2007). In the absence of such authority, as is the case here, "the issue has not been resolved *plainly*." *United States v. Wynn*, 684 F.3d 473, 480 (4th Cir. 2012) (emphasis in original).

D.

Apart from her challenge to the guideline application, Davis also argues more generally that the district court abused its discretion because mitigating factors warrant a downward variance sentence substantially below 10 years. This argument - which is consistent with her position below - presents a straightforward challenge to the length of the sentence in light of her particular circumstances and the § 3553(a) factors, and it therefore questions the substantive reasonableness of the sentence. *See United States v. Hargrove*, 625 F.3d 170, 183-84 (4th Cir. 2010) (discussing various substantive

16

reasonableness theories). As is evident from our previous discussion, we find no merit to this argument.

Looking at the "totality of the circumstances," *Gall v. United States*, 552 U.S. 38, 51 (2007), we are satisfied that the court did not abuse its discretion by imposing the presumptively reasonable 10-year sentence. The court properly considered the parties' sentencing arguments and provided a reasoned explanation for the sentence, with specific consideration of the § 3553(a) factors and Davis' downward variance request.

III

Based on the foregoing, we affirm the conviction and sentence.

*AFFIRMED*